UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | )    No. 1:21-cr-00603 |
| v. | ) |
| | ) |
| RASHAD SANFORD, | ) |
| | ) |

**SENTENCING MEMORANDUM SUBMITTED
ON BEHALF OF RASHAD SANFORD**

                      John A. Garland
                      Email: jag@gsllaw.com

                      Don Samuel
                      Email: dfs@gsllaw.com

                      Garland, Samuel & Loeb, P.C.
                      3151 Maple Drive
                      Atlanta, GA 30305
                      Work: (404) 262-2225

## I.  PRELIMINARY STATEMENT

Dr. Sanford asks the Court to impose the sentence recommended by USPO Specialist Robert Flemen: time served, three years supervised release, 120 hours of community service per year (360 hours total), $80,000 restitution, with the standard and special conditions described in the PSR.  PSR pgs. 50-56.

## II.  Guidelines

Dr. Sanford agrees with the guideline calculations in the PSR. Total offense level of 12. Criminal history category I.  Imprisonment range of 10 months to 16 months. PSR pg. 41, ¶228

## III.  THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) AS APPLIED IN THIS CASE SUPPORT THE SENTENCE RECOMMENDED IN THE PSR OF TIME SERVED, THREE YEARS SUPERVISED RELEASE, AND 360 HOURS OF COMMUNITY SERVICE.

The overarching sentencing principle behind Section 3553(a), often called the parsimony clause, is that a sentencing court "*shall impose a sentence sufficient but not greater than necessary*" to meet the goals of sentencing.[1]  The Court must craft a sentence that has the right combination of conditions and that is just harsh enough to meet the goals of sentencing but no harsher.  Unlike the guidelines, this task is not

---

[1] (emphasis added). The parsimony clause is "not just another 'factor' to be considered along with others in § 3553(a) – it sets an independent limit on the sentence a court may impose.  David L. McColgan & Brett G. Sweitzer, *Grid & Bear It*,  29 Champion 50, 50 (2005).

one of numbers and tables, but instead is one of fuzzy indeterminate factors that require careful examination and thoughtful consideration by the Court. In reaching the ultimate sentence there is not one correct answer, but there are many wrong ones.

Subparagraph 2 of Section 3553(a) directs that "[t]he court, in determining the particular sentence to be imposed, shall consider" the following factors relevant here:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—
(A) to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with . . . medical care . . . in the most effective manner;

(3)  the kinds of sentences available; and …

(4)  the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

The factors enumerated in Section 3553(a) are the "bedrock of all federal sentencing." *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). In crafting the proper sentence, the "the judge

should consider all of 18 U.S.C. § 3553(a)'s factors. In so doing, the judge "must make an individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 39 (2007).

**a.  18 U.S.C. § 3553(a)(1): The Nature and Circumstances of the Offense.**

Dr. Sanford committed fraud, placed his chiropractor license at risk, and will spend the rest of his life as a convicted felon. Dr. Sanford does not dispute the facts set forth in the PSR, but it is important to note that he had no awareness of, or participation in, most of the facts set forth in the PSR. Only two paragraphs cover Dr. Sanford's offense conduct. PSR pg. 13, ¶ 36, pg. 26, ¶ 127.

**b.  18 U.S.C. § 3553(a)(1): the history and characteristics of the defendant.**

It is no accident that the first criterion under § 3553(a) – The Nature and Circumstances of the Offense *and* The History and Characteristics of the Defendant - was drafted by Congress in the conjunctive. In imposing a fair and just sentence, justice dictates that the crime committed by a defendant should not be viewed in a vacuum but in light of the defendant's unique history, circumstances, and humanity. It has long been recognized that a defendant's character is always "a central consideration in the fashioning of a just sentence." *United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir. 1993). As the respected jurist, the Honorable Jed S. Rakoff so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and

his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant'.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). The U.S. Supreme Court has voiced similar views *See Gall v. United States*, 552 U.S. 38, 52 (2007) ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113, (1996)); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4 (sentencing court not limited regarding the information about a defendant's background, character and conduct that it may consider when imposing an appropriate sentence).

As detailed in the PSR, Dr. Sanford is a dedicated husband, a loving father, a skilled Chiropractor, and is actively engaged in giving back to others. Attached are exhibits documenting these aspects of his life:

- Exhibit A – Photos of Dr. Sanford with his children.
- Exhibit B – Photos and videos of some of his mentorship activities.
- Exhibit C – Photos and videos of some of his community service.

- Exhibit D – Photos and videos of Dr. Sanford treating basketball players in his office and on the road at tournaments, and testimonials from his athlete and non-athlete patients.

- Exhibit E - Character letters written on Dr. Sanford's behalf (Excerpted below are quotes from many of the letters).

Curtis Finch (Ex. D pg. 2), a friend who has known Dr. Sanford as a friend, business associate and as a patient, writes,
- Rashad's dedication to making a positive impact is truly inspiring, and his contributions have made a significant difference in the lives of many. I have witnessed firsthand Rashad's strong work ethic, his compassion for others, and his ability to lead by example. His integrity, honesty, and reliability are unparalleled, making him someone you can always depend on.

David Irons (Ex. D pg. 3), Sr., a patient who has known Dr. Sanford for over sixteen years writes:
- My and Dr. Sanford's relationship started out as a professional one but developed into a real friendship. Dr. Sanford has been extremely supportive of our charitable programs for example we take twenty-five deserving youth from the Atlanta area to Tampa, to participate in an NFL community relations camp. The NFL/NFLPA Sandlot 7v7 Tournament.

Vonetta Keit (Ex. D pg. 4), another patient echoes these same sentiments:
- I arrived at Atlanta Spine Doctors in severe pain and a panic mindset. On an early Friday morning, I had awakened to loss of mobility to the entire right side of my body due to an unexpected medical accident. Desperately seeking medical attention, my options were limited. I was uninsured and it was a challenge to receive medical attention. After sharing my concerns with a friend, he immediately contacted Dr. Sanford. Without hesitation, instead of turning me away and locking their office doors for the day, they patiently waited for my arrival while welcoming me with open arms and the upmost professionalism even though I was in an extreme frantic state of mind. After 3 hours of medical treatment, I regain mobility on my right side. Fast forward nine years later. After one malpractice issue and four auto accidents along with various adventurous activities that are not necessarily provide by Dr. Sanford, I am still receiving the same level of exemplary, professional,

caring, and show of true concern for my well-being.
- This letter is just the reflection and voice of one patient. However, I am the voice of many. In conversations with some of his patients under his care well over fifth teen years, one thing remains the same. We all have an extreme level of appreciation, admiration, and nothing but the upmost respect for Dr. Sanford. We consider ourselves lifetime patients because we trust him as a person, trust him as a professional, trust him with our health, and want nothing for the best for him and his practice.

Natalie Godwin (Ex. D pg. 5), discusses Dr. Sanford's community service in her letter:
- I've also seen Dr. Sanford volunteer his time and services to help underserved communities. He's empowered, mentored, encouraged and cultivated the careers of dozens of students with financial assistance and strategic counsel. He creates opportunities and meaningful connections throughout metropolitan Atlanta.

Eric Norwood (Ex. D pg. 6), Sr. reveals the impact that Dr. Sanford had on his nascent business:
- His expertise, love and compassion for people in the community as well as all of his patients benefits from his passion to heal and teach all who encounter his presence. He is a pillar in our society and always looking for ways to help individuals in need. He is the reason who I am today as a businessman. I look up to him in more ways than one. Rashad has taught me more about entrepreneurship and business than I could express within this letter. I've relied on his knowledge and mentorship to establish my last business.

Leon Woolford (Ex. D pg. 7), a friend ever since grade school in Philadelphia writes:
- Dr. Sanford has been a pillar of strength and innovation in the Greater Atlanta community. His unwavering commitment to excellence and his visionary leadership have not only propelled Atlanta Spine Doctors and Breakfast at Barney's to new heights but have also made a significant impact in the medical community and the local economy.
- Dr. Sanford has an exemplary work ethic and employs the highest standard for any task given or taken. He goes above and beyond whenever anything is asked of him.

Jazmane Jenkins (Ex. D pg. 8), friend from boarding school and current Atlanta resident gives an example of how Dr. Sanford's generosity extends beyond his public facing charity works:

- There was a time recently when I personally had been going through a rough patch financially and emotionally while pursing my career as a medical professional. Dr. Rashad without hesitation gave support where it was needed and helped me pull through one of the toughest moments in my life and I am forever grateful for that.

Juan Farmer (Ex. D pg. 9), patient turned friend describes being able to count on Dr. Sanford:

- I've had to count on him on numerous occasions. From helping me open Sea Salt Restaurants ... To being a speaker for our Sea Salt Cares events where we give back to underprivileged youth. Dr. Sanford is a person without a doubt in my mind that I know I can count on for just about anything.

Perhaps the most revealing, are the words of his wife of 18 years Karrie Grigsby Sanford (Ex. D pgs. 10-11), who exalts in his dedication to family:

- During a time where I was emotionally distraught while handling a family crisis that happened with my brother that resulted with me going on FMLA; Rashad stepped in and led the efforts to getting me healthy emotionally and mentally by assisting me with securing the mental help that I needed from a psychiatrist, taking me to my appointments, and encouraging me on a daily basis with staying resilient. Rashad's love, patience, and support helped me to become emotionally balanced and at a state of dealing with events out of my control and paying it forward with others who have incurred similar situations.
- From the birth of both of our children, Rashad truly put their needs truly above his own and would stop what he was doing at a moment's notice to be present any time I called him about when I received calls of them having allergic reactions, slip/trips/falls, and a febrile seizure. He would educate me on the pediatric steps through a holistic lens on the action I needed to take on each incident and would due the necessary follow up and treatment plans to nurse them back to a healthy state.
- Rashad not only spends quality time with our children, but he also has been coaching my son's basketball team. He is committed to pouring into the youth not only from a skills perspective but teaching them life skills with

- how to function as a team, respect diversity of thought, deal with emotions, and knowing how to manage not winning every game. He also has made an impact on some of the at-risk youth whom he has impacted by providing ways for them to stay emotionally balanced.
- Lastly and most important, my son considers his dad his best friend and although is supposed to be at sleep at a certain time he sneaks to stay awake to try and catch his father to talk to him…No matter how tired Rashad is he plays with his son before trying to jump in the shower and relax after a long day.
- Dr. Rashad Oronde' Sanford not only loves his family deeply, but he also loves the community in which he serves…
- Lastly, Rashad is the youngest out of his three siblings ... I have observed anytime there was a family crisis his siblings and/or mother at the time would call him and he would ALWAYS get the issue resolved and/or offer advice to get everyone at a place of peace; gained consensus. During the time his mother went through cancer, Rashad ensured that she had the best doctors from Philly to Atlanta and worked with them to manage her care…

The letters written on Dr. Sanford's behalf describe someone who is generous with his friends, charitable with his community, dedicated to the wellbeing of his patients, and honorable in his business dealings. The letters highlight that Dr. Sanford is far more than his offense conduct. His crime should be viewed, not as the primary indication of who he really is, but instead as failure to live up to who he is and has been outside his offense. His punishment should reflect that fact. Dr. Sanford's history and characteristics support a fair and just sentence of time served, three years supervised release, and 360 hours of community service as recommended in the PSR.

## c. 18 U.S.C. § 3553(a)(2)(A): the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment for the offense.[2]

In evaluating punishment and retribution, society considers the offender's degree of blameworthiness and the amount of harm done and imposes punishment accordingly.[3] A non-custodial sentence for Dr. Sanford adequately considers the seriousness of, and provides just punishment for, the offense based on the facts of the offense.

## d. General Deterrence - 18 U.S.C. § 3553(a)(2)(A): the need for the sentence imposed to promote respect for the law & 18 U.S.C. § 3553(a)(2)(B): the need for the sentence imposed to afford adequate deterrence to criminal conduct.

Imposing the sentence recommended in the PSR of time served, three years supervised release, and 360 hours of community service, aligns with the *general deterrence* purposes mandated under § 3553(a). Indeed, research has consistently shown that, while the certainty of being caught and the swiftness in imposing punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[4] "[E]mpirical research shows no

---

[2] The need "to promote respect for the law" grouped with general deterrence below.

[3] *See* Hon. James S. Gwyn, *Juror Sentiment on Just Punishment: Do Federal Sentencing Guidelines Reflect Community Values?* Harvard Law Review and Public Policy Review, 2010 [Vol.4.p.173-200].

[4] M. Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006); *See also United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the *duration* of incarceration provides little or no general deterrence for white

relationship between sentence length and deterrence."[5]

> there is no evidence that increases in sentence length reduce crime through deterrence. Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects …[6]

Furthermore, the "general deterrence" alone cannot support the weight of a sentence sending an individual to prison.[7] Section 3553(a) "does not require the goal of general deterrence be met through a period of incarceration."[8]

### e. Specific Deterrence - 18 U.S.C. § 3553(a)(2)(C): the need for the sentence imposed to protect the public from further crimes of the defendant.

---

collar crimes."). "Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence." *Id.*; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflt. Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity"); Anthony N. Doob & Cheryl Marie Webster, *Sentencing Severity and Crime: Accepting the Null Hypothesis,* 30 Crime & Just. 143 (Univ. Of Chicago 2003) (arguing that severity of punishment does not deter crime).

[5] Amy Baron-Evans, *Sentencing by the Statute*, at 7 (Apr. 27, 2009).

[6] *Id.* quoting Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: *A Review of Research*, at 28-29 (2006) (emphasis in original).

[7] *See United States v. Corsey*, 723 F.3d 366, 381 (2d Cir. 2013) (Underhill, J., concurring) (where the district court's § 3553 analysis relied "almost exclusively on one word – deterrence," that factor simply could not "bear the weight assigned it in the totality circumstances of in the case." (quoting *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008)).

[8] *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010); *See also United States v. H. Ty Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015) (finding the message sent by probationary sentence in tax evasion case with advisory Guidelines of 46-57 months sufficient to satisfy general deterrence under § 3553(a)).

Specific deterrence has been achieved. Dr. Sanford's statement (Exhibit F) demonstrates a clear understanding of the seriousness of his actions, and remorse for what he did. Dr. Sanford's fraudulent conduct ended over 4 years ago at the end of 2019, prior to any investigation by law enforcement. In the intervening four plus years, Dr. Sanford has led a law-abiding life. The process of being held to account for his criminal conduct has only further solidified Dr. Sanford's commitment to live a law-abiding life. His full compliance with subpoenas from the Government, turning himself in, his recognition of his wrongdoing, and his remorse, collectively demonstrate incarceration is not needed to achieve specific deterrence. Incarceration would in fact have the opposite effect, destabilizing him and decreasing his chances of successfully transitioning to a successful life post-conviction.

Dr. Sanford has zero criminal history points. As such, he is among the category of offenders that present the lowest risk to re-offend. The U.S. Sentencing commission recently explained "[i]n several recidivism studies, the Commission found that zero-point offenders recidivated far less often than other offenders (27% vs. 42% for one-point offenders, and 49% overall).[9]

Specific deterrence does not require incarceration. Courts have recognized the serious impact even non-custodial sentences have on a defendant. As explained

---

[9] U.S. Sentencing Commission, 2023 AMENDMENTS IN BRIEF, Amendment #821 Criminal History.

by the Supreme Court in *Gall, supra*, when the Court upheld a sentence of 36 months' probation for a defendant where the bottom of the Guidelines was 30 months incarceration:

> … We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.
> …

*Id.* at 48-50 (citations omitted).

Courts have also recognized that society benefits from sentencing individuals to shorter or non-custodial sentences that would allow them to use their skills to better serve the community.[10]

---

[10] *United States v. Coughlin*, No. 06-CR-20005, 2008 WL 313099, at *7 (W.D. Ark. Feb. 1, 2008) (sentencing a Walmart executive who pled guilty to aiding and abetting wire fraud and filing false tax returns, yielding a guideline range of 27 to 33 months of imprisonment, to five years' probation, including 27 months of home detention and 1,500 hours of community service in part because defendant's "expertise is better put to use than wasted in the physical deterioration of unnecessary imprisonment"); *United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (despite a Guidelines range of 46 to 57 months, the court affirmed a sentence of a defendant to two years' probation; district court found that due to defendant's extensive philanthropy, "'society will be best served by allowing [defendant] to continue his good works'

Incarceration would make him more vulnerable to recidivate as it would expose him to the anti-social attitudes of other detainees in BOP custody, and it would impede the steps he needs to take to rebuild his life and career post-conviction. Sentencing Dr. Sanford to the sentence recommended in the PSR of time served, three years supervised release, with 360 hours of community service, will help to reinforce and support the goal of specific deterrence without violating the mandate of the parsimony provision.

**f.  18 U.S.C. § 3553(a)(3): the kinds of sentences available.**

Dr. Sanford is not subject to a mandatory minimum term of imprisonment. The sentence recommended in the PSR of time served, three years supervised release, and 360 hours of community service, is available to the Court.

The Court should consider that the annual cost of confinement ($49,770) is over ten times greater than the annual cost of supervision ($4,387). PSR pg. 42, P 237. *See also, United States v. Graham*, 915 F.3d 456, 460 (7th Cir. 2019) (court's consideration of incarceration costs, although not explicitly mentioned in 18 U.S.C. § 3553(a), appropriately played into its analysis of the cost benefit to society, and

---

outside of prison"); *United States v. Smith*, No. 1:06-CR-00394, 2009 WL 249714, at *4 (N.D. Ohio Feb. 2, 2009) (finding community service would put defendant's abilities as an accountant and lawyer to "good use," and commented that those "abilities [] would otherwise be wasted during a more lengthy prison term"); *United States v. Collado*, No. 07-CR-1144, 2008 WL 2329275, at *5 (S.D.N.Y. June 5, 2008) (noting "community would be better served by having [defendant] in it and available to provide substance abuse treatment to others").

the benefit to the inmate when determining sentence); *United States v. Scholar*, 252 F.Supp.3d 711 (E.D.Wi. 2017) (finding a lengthy period of home confinement would be as efficient, and less costly, than imprisonment as a form of punishment for defendant with serious health conditions).

A House Judiciary Committee report relied upon by Congress in voting overwhelmingly to pass the First Step Act of 2018, P.L. No. 115-391 found:

> … [the Bureau of Prisons] has a growing prison population that, because of its rising costs, is becoming a real and immediate threat to public safety. … If the current spending trajectory continues and we do not reduce the prison population and prison spending, there will continue to be fewer and fewer prosecutors to bring charges, fewer agents to investigate federal crimes, less support to state and local criminal justice partners, less programs, and cuts along a range of other criminal justice priorities . . .

H.R. Rep. No. 115-699, at 23-24 (2018) (internal citations omitted).[11]

## g. 18 U.S.C. § 3553(a)(4): the sentencing range established by the guidelines.

The Guideline fraud loss calculations can lead to overly harsh recommended ranges. Instead of accurately positioning a defendant's conduct along the scale of culpability as the Guidelines are meant to, these sentences allow loss figures to

---

[11] See also, Ames Grawert *et al.*, *Ending Mass Incarceration: A Presidential Agenda*, Brennan Center for Justice 1, 2 (2019); H.R. Rep. No 115-699, at 22 (2018) (explaining that Congress saw a need to reform the federal prison system "through the implementation of corrections policy reforms designed to enhance public safety by improving the effectiveness and efficiency of the federal prison system in order to control corrections spending, manage the prison population, and reduce recidivism.")

dominate the Guidelines analysis to the exclusion of other factors both within the Guidelines and under Section 3553(a). Judge Rakoff of the Southern District of New York has observed that the Guidelines have often "so run amok that they are patently absurd on their face" due to the "kind of 'piling-on' of points for which the guidelines have frequently ben criticized." *United States v. Adelson, supra,* 441 F.Supp. 2d 506, 510, 515 (S.D.N.Y. 2006), *affirmed,* 301 F. App'x 93 (2d Cir. 2008). Commentators have expressed similar criticisms. *See, e.g.,* Barry Boss and Kara Kapp, *How the Economic Loss Guideline Level Lost Its Way, and How to Save It,* 18 OHIO St. J. CRIM. L. 605, 617-20 (2021) (highlighting that the "loss tables are insensitive to motive."); *United States v. Musgrave,* 647 Fed. Appx 529, 538 (6th Cir. 2016) ("But there is reason to believe that, because the loss Guidelines were <u>not</u> developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances.)

Further, public opinion polls reveal that prison terms recommended by the guidelines dramatically exceed public expectations. *See* Hon. James S. Gwyn, *Juror Sentiment on Just Punishment: Do Federal Sentencing Guidelines Reflect Community Values?* Harvard Law Review and Public Policy Review, 2010 [Vol.4.p. at 175]  (The median juror recommended sentence was only 19% of the median Guidelines ranges and only 36% of the bottom of the Guidelines ranges). Studies have shown that the median Guidelines range was more than 10 times greater than

the median juror's recommendation. In fact, in a study of 261 cases, jurors recommended a sentence significantly lower than the Guidelines 90% of the time. *Id.* at 187-188. This public sentiment suggests that the Guidelines may overstate the importance of punishment at the expense of other sentencing considerations.

**h. 18 U.S.C. § 3553(a)(6): the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Sentences that don't impose incarceration are common among defendants with guidelines matching Dr. Sanford's, over half (52%) receiving a sentence of either probation or a fine only.[12] [13]

The U.S. Sentencing commission recently explained:

In FY 2021, zero-point offenders accounted for one-third of the federal sentencing caseload. The district courts sentenced just 39% of these offenders within the guideline range—often citing overstatement of criminal history as a reason for the below-range sentence.

U.S. Sentencing Commission, 2023 AMENDMENTS IN BRIEF, Amendment #821 Criminal History.

---

[12] See Judiciary Sentencing Information at pg. 46 of the PSR.

[13] "The *Defendants Receiving Probation* category includes defendants sentenced to a term of probation with or without a condition of community confinement, intermittent confinement, or home detention (Probation Only and Probation and Alternatives). This category also includes defendants who received no prison, no probation, and no time of alternative confinement as defined in USSG §5C1.1, but instead who received a fine and/or a special assessment (Fine Only)." https://jsin.ussc.gov/analytics/saw.dll?Dashboard

**i. 18 U.S.C. § 3553(a)(7): the need to provide restitution to any victims of the offense.**

Restitution is $80,000. PSR pg. 42, ¶ 238. Any day in custody is a day that Dr. Sanford can't work to pay the restitution and that distances him from a productive life post-conviction.

**IV. THE SENTENCE RECOMMENDED IN THE PSR OF TIME SERVED, THREE YEARS SUPERVISED RELEASE, AND 360 HOURS OF COMMUNITY SERVICE, IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO MEET THE GOALS OF SENTENCING.**

A felony conviction, with the sentence recommended by USPO Specialist Robert Flemen[14] accounts for what Dr. Sanford did, and who he is outside his offense conduct, while giving back to his community and satisfying the section 3553(a) factors including the mandate of the parsimony provision.

Respectfully submitted, this the 18th day of April 2024.

**/s/ John A. Garland**
John A. Garland
Email: jag@gsllaw.com

**/s/ Don Samuel**
Don Samuel
Email: dfs@gsllaw.com

Garland, Samuel & Loeb, P.C.
3151 Maple Drive

---

[14] Time served, three years supervised release, 120 hours of community service per year (360 hours total), $80,000 restitution, with the standard and special conditions described in the PSR. PSR pgs. 50-56

>Atlanta, GA 30305
>Work: (404) 262-2225

## CERTIFICATE OF SERVICE

I hereby certify that on today April 18th, 2024, I electronically filed **SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF RASHAD SANFORD** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys and parties of record.

By: **/s/ John A. Garland**
Garland, Samuel & Loeb, P.C.
3151 Maple Drive
Atlanta, GA 30305
Work: (404) 262-2225
Email: jag@gsllaw.com